IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>COLBY JOHN KOPP,<br><br>*Defendant*. | Case No. 1:22-CR-190<br><br>Hon. Leonie M. Brinkema<br><br>Sentencing: April 18, 2023 |

## GOVERNMENT'S POSITION ON SENTENCING

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("Guidelines" or "USSG"), hereby provides its position with respect to sentencing of the defendant, Colby John Kopp. The defendant pleaded guilty to his role in a conspiracy to distribute 40 grams or more of fentanyl in northern Virginia and elsewhere, in violation of 21 U.S.C. §§ 841 and 846. The United States has no objection to the Probation Officer's calculations of the defendant's Guidelines, as set forth in paragraphs 51–61 and Part D of the Presentence Investigation Report (PSR) (ECF No. 47). For the reasons set forth herein, the United States respectfully submits that a term of incarceration of 135 months is appropriate in this case.

## BACKGROUND

In August 2020, agents with the Federal Bureau of Investigation ("FBI") discovered a vendor operating on the darknet website Empire Market using the name "MadHatterPharma," who advertised for sale various amounts of pressed pills containing fentanyl. The profile indicated that the account was created on May 4, 2020 and that the vendor had completed at least 554 sales by

the time the FBI identified the account in August. MadHatterPharma operated on several darknet markets between April 2020 and February 2021, completing over 700 sales of pressed pills containing fentanyl. It was operated by the defendant and others to further a Connecticut-based fentanyl distribution operation.

MadHatterPharma accepted Bitcoin as payment for fentanyl pills it shipped to customers across the United States using the United States Postal Service ("USPS"). MadHatterPharma sold the fentanyl pills for $9 each for orders of up to 99 pills and scaled the price so each pill was $7 for orders between 301 and 9,999 pills. To avoid detection, the defendant and his co-conspirators mailed drug parcels that did not have their true names and addresses listed as the return information, deposited those parcels at various USPS collection boxes, and handled packages in a manner to attempt to avoid leaving fingerprints.

On or about August 23, 2020, Empire Market went offline and the operators of MadHatterPharma began conducting sales of fentanyl pills via direct deals on Wickr, an encrypted messaging application, under the username "hatmatter." Between August 2020 and November 2020, an FBI agent acting in an undercover capacity completed five controlled purchases of fentanyl from the individuals operating MadHatterPharma and hatmatter, including the defendant. The defendant and his co-conspirators, who all resided in Connecticut, sent each shipment of fentanyl to an FBI undercover mailbox in the Eastern District of Virginia. The FBI paid for a sixth order of fentanyl pills but never received the shipment. In total, KOPP and others sold approximately 75.38 grams of fentanyl to the FBI. The tablets received by law enforcement had markings of "M" and "30" which are consistent with known markings for 30 milligram Percocet tablets.

The conspiracy involved at least seven individuals working in various capacities over the course of its operation. Unindicted Coconspirator One ("UCC-1") obtained the fentanyl from sources in Connecticut. The defendant created the darknet market vendor profiles where the fentanyl pills were sold to customers. He operated vendor accounts on at least four marketplaces, including Empire Market, Dark Market, While House, and Icarus. He also maintained the Wickr account that he used to conduct direct sales of fentanyl pills to customers.

After conducting the sales either on the darknet using "MadHatterPharma" and via Wickr using "hatmatter," the defendant provided the names and mailing addresses of customers to other members of the conspiracy, including Unindicted Coconspirator Two ("UCC-2") and Unindicted Coconspirator Three ("UCC-3). UCC-2 and UCC-3 then printed the names and addresses on mailing labels, packed the parcels of fentanyl pills, and mailed them at various Post Offices in the area. Sutton was responsible for obtaining packaging materials. The defendant handled at least one package containing fentanyl pills as evidenced by the fact that the defendant's fingerprints were located on the external packaging of the shipment received by the FBI on September 10, 2020.

During the conspiracy, the defendant ordered at least 11 kilograms of Firmapress baby blue tableting mix over seven transactions. Six of the seven orders were shipped to the residence shared by UCC-1 and Sutton. In July 2020, the defendant purchased accessories for a manual pill press machine on two occasions, including die punches for stamping "M" and "30" into a pressed pill. The accessories also were shipped to the residence shared by UCC-1 and Sutton. At times during the conspiracy, the defendant and UCC-1 pressed the pills in the basement of the apartment where UCC-1 and Sutton lived. Later, the pill press was moved to the home of another unindicted co-conspirator.

One of the defendant's primary responsibilities was the management of financial transactions associated with the sale of pressed pills containing fentanyl on darknet marketplaces and via Wickr. He posted on darknet forums such as Dread, which is a Reddit-like darknet discussion forum, where he sought guidance on how to convert "dirty" Bitcoin into a more private cryptocurrency known as Monero to try to anonymously get cash from his drug sales. He also posted in a Dread forum dedicated specifically to opiates to let readers know that MadHatterPharma was selling on White House and Icarus after Empire Market went offline. The defendant used Coinbase, a company that provides a secure platform to buy, sell, and store cryptocurrency like Bitcoin. The defendant transferred Bitcoin proceeds of darknet marketplace and direct Wickr sales of pressed pills containing fentanyl directly to his Coinbase account, and from a Bitcoin wallet to a Coinbase account registered to Sutton. On several occasions, after selling the illicit Bitcoin to Coinbase, the defendant transferred money from his Coinbase account to his PayPal account. Over the course of the conspiracy, the defendant transferred approximately $51,000 of MadHatterPharma proceeds from his Coinbase account to his PayPal account. He also transferred approximately $4,650 directly from the MadHatterPharma wallet to UCC-2 and UCC-3. In total, between May 2020 and January 2021, he transferred over $140,000 of Bitcoin to Sutton's Coinbase account, all of which was proceeds from the sale of pressed fentanyl pills facilitated by the defendant. Though Coinbase account was registered to Sutton, she regularly texted a code to the defendant and UCC-1 to allow them to withdraw the illicit Bitcoin from her Coinbase account to sell at Bitcoin ATMs.

The defendant was charged by criminal complaint on February 10, 2022, with conspiracy to distribute at least 40 grams or more of fentanyl. The next day, federal agents attempted to

arrest him in Connecticut but were unsuccessful as he fled the area and remained a fugitive for almost seven months. The defendant arrived in this District on September 8, 2022 and turned himself in on September 9, 2022, at which time he made his initial appearance. He was released from custody on September 13, 2022. On January 17, 2023, the defendant pleaded guilty to a single-count Criminal Indictment. His sentencing is scheduled for April 18, 2023.

## SENTENCING ANALYSIS

### I. Law on Sentencing

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence. Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the

5

purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. 18 U.S.C. § 3553(a).

**II.   Guidelines Calculation**

The government agrees with the Probation Officer that, pursuant to USSG § 2D1.1(c)(5), the base offense level is 30. The government also agrees with the application of the two-level adjustment for distributing a controlled substance through mass-marketing by means of an interactive computer service, pursuant to USSG § 2D1.1(b)(7), as well as the four-level adjustment due to the defendant's role as an organizer of a criminal organization that involved five participants. USSG § 3B1.1(a). The government agrees with the two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). In accordance with the plea agreement, the government hereby moves for the additional one-point reduction under USSG § 3E1.1(b), which is already reflected in Probation Officer's calculations, leading to a total offense level of 33.

The defendant's criminal history score is zero. The defendant's total offense level of 33 and criminal history category I yields an advisory Guidelines range of 135–168 months for Count One, which carries a statutory five-year mandatory minimum term of incarceration.

**III.   The Defendant is Ineligible for Safety Valve**

The defendant is not eligible for safety valve for two reasons. U.S.S.G. § 5C1.2.1. First, the defendant has failed to disclose "all information . . . concerning the offense or offenses that

were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(a)(5). As of the time of this filing, the defendant has not provided any information to the government.

The defendant is also ineligible for safety valve because his conduct qualifies him for an aggravating role under the Guidelines. U.S.S.G. § 5C1.2(a)(4). The Guidelines state that being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" qualifies for an aggravating role enhancement. U.S.S.G. § 3B1.1(a). The Guidelines further direct the Court to consider several factors, including "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crimes, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* cmt. nt. 4.

The defendant was an organizer of the operation and managed several co-conspirators who were junior to him. He knew the dangerous nature of the pills he sold and involved others in the business by having them physically handle the drugs and package the parcels for shipment. He managed the entire darknet presence of MadHatterPharma and hatmatter, in coordination with UCC-1. He interfaced with every customer. He kept track of the quality of the pills he sold based on reviews and customer feedback, even explaining to the undercover that some pills varied in appearance due to the use of a different compressor or a different binding agent. He was responsible for ordering the binding agent and the pill press accessories used by UCC-1 and others to press the pills. He gave the names and addresses of the customers to UCC-2 and UCC-3 so that they could print labels for the packages. He facilitated every single sale of fentanyl pills on the darknet and Wickr. And he managed the Bitcoin coming in the door and set up all the

necessary financial accounts so that he could convert illicit Bitcoin to cash, including by setting up accounts in Sutton's name and showing her how to convert Bitcoin to cash. In addition to Sutton, UCC-1, UCC-2, and UCC-3, several other unindicted co-conspirators helped press the pills and sourced the fentanyl.

Based on the defendant's decision-making authority, the extensive nature of his participation in the offense, his management of lower-level participants, and the amount he profited compared to his co-conspirators, the defendant was an organizer of criminal activity that involved *at least* six other participants and, therefore, the four-level adjustment under USSG § 3B1.1(a) is appropriate. As a result, he should be deemed ineligible for safety valve.

IV. Section 3553(a) Analysis

    a. Nature and Circumstances of the Offense

From April 2020 through February 2021, the defendant helped run a darknet fentanyl distribution operation that saw over 700 sales of counterfeit pressed pills containing fentanyl across the country. Fentanyl is the deadliest drug available on the streets today. As a few milligrams can be fatal, the quantity of pills the defendant distributed is capable of inflicting immeasurable damage in a community. The counterfeit pressed pills at issue were blue and marked with "M" on one side and "30" on the other, which is consistent with 30mg Percocet. Counterfeit pressed pills are incredibly dangerous because they are made to look like real prescription pills but there is no way to know how much fentanyl is in each one. Some users may not know they contain fentanyl at all.

In this case, the defendant's customers knew exactly what they were getting. MadHatterPharma and hatmatter sold only one thing— "blues"—and the vendor profiles created

by the defendant explicitly stated that the pills were "pressed with fent and morphine." The nature of the offenses committed by the defendant is incredibly serious. He knew how dangerous it was, as evidenced by the fact that he warned customers about the strength of the product on the MadHatterPharma vendor profiles. The defendant wrote, "PRODUCT IS STRONG. START WITH HALF A PILL AND MOVE UP FROM THERE."

Records from the darknet marketplaces used by the defendant and his co-conspirators revealed that from April 2020 through February 2021, MadHatterPharma engaged in over 700 transactions involving the sale of pressed pills containing fentanyl. That total does not include the number of direct deals completed via Wickr. They were selling enough to scale the price of pills so that customers paid less if they ordered between 301 and 9,999 pills. The defendant is being held responsible only for distributing at least 400 grams but less than 1.2 kilograms of fentanyl. That range is incredibly conservative as it assumes that each order was for the minimum amount of ten pills, despite MadHatterPharma requiring returning customers to purchase a minimum of at least 20 pills. During one conversation with the undercover on Wickr, he bragged that he sold 11 hundred-packs that day alone. While on Dark Market, the defendant ran a promotion where he included a "free 20% extra" on the next order if the purchaser was a returning customer and released all the purchase funds in escrow within a certain amount of time. That the defendant ordered over 11 kilograms of blue binding agent to mix with the fentanyl indicates that business was robust.

The scope of the operation was large, and it was lucrative. The defendant was unemployed during the conspiracy. Yet, over the course of approximately nine months while engaged in the sale of fentanyl pills, he transferred over $51,000 to his PayPal account. He

transferred another $140,000 of Bitcoin to Sutton's Coinbase account and approximately $4,560 to UCC-2 and UCC-3. During one exit scam, the operation lost approximately $70,000 held in escrow on the darknet site they were using at the time.

The circumstances of the offense, including the significant quantity of fentanyl pills distributed by the defendant and the potentially fatal dose of fentanyl in each pill he distributed, justify a sentence in the Guidelines range. He profited off a terrible public health crisis. The drugs the defendant sent were powerful and in sufficient quantity for numerous deadly highs. He committed his crimes in a particularly savvy way, using the darknet to order and fulfill orders of deadly drugs. The defendant showed a flagrant disregard for the safety of others and focused only on getting rich. An especially egregious aspect of this offense is that the defendant marketed himself as "the plug's plug," meaning that he intended the pills he sold to customers to be redistributed to others. The Guidelines range is calculated accurately, and the government is unaware of any factor that warrants a downward variance.

  b. **History and Characteristics of the Defendant**

The government acknowledges that the defendant has no criminal history and that he has complied with the conditions of his pre-trial release. Apart from his regular use of cocaine, his drug use appears consistent with recreational use. He was not selling drugs to support a personal habit. As he announced on one of the vendor profiles of MadHatterPharma, he was selling drugs to get rich. The defendant obviously is very smart to have accomplished all he did in the instant offense and yet chose to voluntarily engage in the sale of deadly drugs. The defendant's offense conduct, as well as his conduct during the almost seven months between his attempted arrest and when he turned himself in, reveal the defendant's willingness to engage in incredible levels of

deception to conceal his wrongdoing. He went to great lengths to avoid detection by anonymizing his online activity, using burner phones, and even selling his vehicle. The defendant's conduct evidences a disrespect for the Court and for the law. A significant term of imprisonment is necessary to protect the public from the defendant continuing to commit crimes.

### c. Deterrence

General and specific deterrence are salient considerations in fashioning an appropriate sentence in this case. Fentanyl and the associated overdose deaths have reached record levels in this District and across the country. As in this case, it is common for drugs represented as Percocet or other substances to contain fentanyl, which makes it incredibly dangerous to both the user community and to law enforcement. Given the adverse impact that opioid abuse has on society, it is important that the Court impose a sentence that deters others from undermining the rule of law. Furthermore, the use of the darknet in furtherance of opioid trafficking is a persistent problem that is difficult to detect. The sentence in this case must be significant enough to demonstrate to the defendant, and others, that the decision to sell fentanyl is not worth the risk.

### d. The Need to Avoid Unwarranted Sentencing Disparities

While the defendant's only co-conspirator to be charged was sentenced to 12 months and one day in prison, she was substantially less culpable than the defendant. That fact was reflected by the application of a minimal role reduction in her case. She also pleaded guilty in a timely manner, whereas the government's investigation into the defendant continued during the seven months after his arrest warrant was issued. As such, a sentence of 135 months would "avoid unwarranted sentence disparities among defendants with similar records who have been found

11

guilty of similar conduct" because a much higher sentence is justified by the defendant's extensive role in the offense and the amount of drug weight attributable to him. 18 U.S.C. § 3553(a)(6).

## CONCLUSION

For the reasons stated herein, the United States respectfully submits that a sentence of 135 months would be reasonable and sufficient to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Rachael C. Tucker
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 11, 2023, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the United States Probation Officer assigned to the case.

                                            /s/
                               Rachael C. Tucker
                               Assistant United States Attorney
                               Eastern District of Virginia
                               2100 Jamieson Avenue
                               Alexandria, Virginia 22314
                               Tel: (703) 299-3700
                               Fax: (703) 299-3982
                               Rachael.Tucker2@usdoj.gov